2005 UT 75

**STATE of Utah, Plaintiff and Appellee,**

v.

**Geoffrey L. CLARK, Defendant and Appellant.**

No. 20020338.

Supreme Court of Utah.

Nov. 4, 2005.

Mark L. Shurtleff, Att'y Gen., Laura B. Dupaix, Asst. Att'y Gen., Salt Lake City, Dean Saunders, Ogden, for plaintiff.

Michael N. Martinez, Murray, for defendant.

PARRISH, Justice:

¶ 1 Felipe Ruiz Santana retained attorney Geoffrey Clark to defend him against a murder charge. At the end of a four-day trial described by the trial court as an "adventure," the jury convicted Santana as charged. The State thereafter asked the trial court to hold Clark in criminal contempt for his actions during the trial. Following an evidentiary hearing, the trial court granted the motion, sentencing Clark to thirty days in jail without work release or time off for good behavior. Clark appeals both the substance of the criminal contempt order and the sentence imposed. We affirm.

## BACKGROUND

¶ 2 The State filed a motion in limine before trial to prevent Santana from offering evidence as to the victim's history of illegal drug use and propensity for violence. The trial court's in-court ruling on the State's motion, as well as a subsequently-issued written order supplementing that in-court ruling (collectively, the "order"), constituted the predicate for some of Clark's contemptuous acts. The order addressed two issues. First, it specified that "[o]nly criminal convictions for violent offenses can be offered at trial," that "[n]o convictions that are ten years or older may be offered at trial," and that "[n]o arrests are admissible at trial."

¶ 3 The order also addressed the admissibility of evidence indicating the victim's history of illegal drug use. During the preliminary hearing, the medical examiner testified that the victim had a trace of cocaine metabolite in his blood.[1] On the basis of this evidence, Clark argued that the victim had attacked Santana while under the influence of illegal drugs and that Santana's actions should be excused on the theory that Santana acted in self-defense. The trial court ruled that the medical examiner's testimony was irrelevant without expert testimony tying the presence of cocaine metabolite to the victim's behavior on the night of his death. Accordingly, its order prohibited the medical examiner from testifying regarding the cocaine metabolite. The order allowed, however, the testimony of any eyewitnesses who saw the victim actually using cocaine on the night of his death.

¶ 4 The adventure began on the first day of trial, when Clark cross-examined a witness by inquiring if she had ever experienced any alcohol-related legal problems. When she denied having any such problems, Clark asked her to "explain" a piece of paper he held in his hand, though the paper displayed only the witness's name and a charge of disorderly conduct and intoxication. Apart from not being a certified conviction, it displayed no other identifying information and reflected nothing about the resolution of the charge. The State objected, and the trial court sustained the objection. The next morning, before the trial resumed, the trial court reminded Clark:

> I think you know you cannot impeach a witness who's on the stand by saying that they have been arrested. I thought I made that fairly clear in the ruling. Arrests are not admissible. Convictions are, depending on what it's for. And so to just show her a rap sheet or some kind of a printout, I don't think it was appropriate.

¶ 5 Later that day, the State called the medical examiner as a witness. On cross-examination, Clark asked him what he had

---

1. Cocaine metabolite is not cocaine. Rather, it is the compound into which cocaine converts once ingested. Its presence in a person's system suggests only that actual cocaine had been present some time earlier.

found in the victim's system. The State objected, and the trial court sustained the objection. Later, when the trial court gave the jury the opportunity to suggest questions in writing, the jury suggested that the medical examiner be questioned regarding the presence of drugs in the victim's system, though it was unclear whether the suggested question referred to illegal drugs or prescription drugs administered to the victim at the hospital. Seizing upon the opportunity presented by the jury's suggestion, Clark audibly proclaimed it a "great question." When the trial court then asked the medical examiner to identify the drugs the victim received in the hospital, Clark announced his belief that the jury's question addressed illegal—not prescription—drugs.

¶ 6 Out of the jury's presence, the trial court sternly admonished Clark, both for seeking to introduce evidence of the cocaine metabolite in violation of the order and for highlighting the issue by audibly declaring that the jury had suggested a "great question." Nevertheless, the cat was out of the bag, and it appeared to the jury as if the State were withholding evidence. Accordingly, the trial court allowed Clark to question the medical examiner about the presence of cocaine metabolite in the victim's blood.

¶ 7 Clark's lack of adherence to the court's order was only the first chapter of the adventure. On the third day of trial, Clark objected when the State asked a witness for his address, announcing to the jury that "[t]he [c]ourt is well aware of the threats of violence in this case." In fact, there was no evidence of any threat of violence against the witness.[2] During a recess, Clark suggested that the witness really did fear for his life, but the court was not persuaded, noting that Clark could have explained the basis for his objection outside of the jury's presence and concluding that Clark had attempted to prejudice and frighten the jury.

¶ 8 Another chapter of the adventure involved Clark walking away from bench conferences. Clark's co-counsel in the murder trial, who later represented Clark during the contempt hearing, admitted during the contempt proceedings that he "grabbed [Clark] by the collar and pulled him back" to the bench when Clark left the conferences. Clark attempted to explain his behavior by suggesting that he had merely been retrieving his notes or picking up certified copies and that the attorneys attending the conference were "fairly large guys" who could not all fit around the bench.

¶ 9 The final chapter of the adventure unfolded on the fourth and final day of trial, during Clark's closing argument, when he stated that the victim had cocaine in his system. The State objected, claiming the evidence was limited to cocaine metabolite. The court indicated to the State that it could refute Clark's statement in its rebuttal. A few minutes later, Clark described the victim as "hopped up on coke." The State did not object to that statement.

¶ 10 The State did object, however, when it appeared that Clark was tampering with evidence during his closing argument. In his opening statement, Clark had read from Santana's police statement, in which Santana had claimed that his sweatshirt had been torn in the altercation that led to the victim's death. To rebut that claim, the State introduced the sweatshirt into evidence and a police officer testified that it was free of tears when it was collected from the crime scene. During his closing argument, Clark began pulling on the sweatshirt until some of its stitches audibly popped. The State objected. The court deferred comment on the sweatshirt issue until "later" and did not address it again until Clark's contempt hearing.

¶ 11 Following the trial, the State asked the court to hold Clark in contempt. Because the allegedly contemptuous acts occurred in the court's presence, the court could have summarily held Clark in criminal contempt at any point during the trial. *See* Utah Code Ann. § 78–32–3 (2002). Nevertheless, the court scheduled a separate hearing nearly three weeks later in order to "give [Clark] his day in court" and to avoid "dis-

---

**2.** On October 12, 2001, Clark filed a notice with the trial court suggesting that the victim's family had sabotaged his car and had tried to intimidate another attorney defending Santana. The notice made no mention of any threats against the witness.

rupt[ing] the trial or distract[ing] parties from the real issue at trial."

¶ 12 After the hearing, the court held Clark in criminal contempt pursuant to Utah Code section 78–32–1.[3] Its factual findings identified six contemptuous acts: (1) Clark's first violation of the order on the motion in limine, when he attempted to impeach a witness while holding and referring to a piece of paper that was not a certified conviction; (2) Clark's second violation of the order on the motion in limine, when he attempted to introduce evidence of cocaine metabolite in the victim's system; (3) Clark's reference to threats of violence, designed to frighten the jury; (4) Clark's defiance of and lack of respect for the court as demonstrated by his abandonment of bench conferences; (5) Clark's statement during closing argument that the victim was "hopped up on coke," which had no support in the evidence; and (6) Clark's attempt to tamper with the evidence by pulling on the sweatshirt during his closing argument.

¶ 13 The trial court found that Clark (1) knew of and understood the order "concerning the use of the toxicology report"; (2) "knew or should have known the proper method to impeach witnesses"; (3) "knew what could be said in front of the jury during trial and in closing argument"; (4) "willfully and intentionally failed to comply" with the court's orders; (5) "disobeyed [the][c]ourt's orders several times during the four-day trial"; and (6) "had the ability to comply with the orders, and was warned in chambers and out of the presence of the jury about his conduct." The court found the contemptuous acts to have been proven beyond a reasonable doubt, held Clark in criminal contempt, and sentenced him to thirty days in jail without work release or time off for good

behavior. Clark appeals from that order, and we have jurisdiction. *Id.* § 78–2–2(3)(i).

## ANALYSIS

¶ 14 Clark mounts a four-pronged attack on the trial court's contempt order. First, he asserts that the findings of fact on which the order is based are clearly erroneous. Second, he argues that the facts and findings in the record fail to satisfy the substantive requirements for an order of contempt. Third, Clark suggests that the trial court was biased against him and abused its discretion by allowing its bias to interfere with his obligation to zealously represent his client. Finally, Clark contends that the sentence imposed by the trial court constituted an abuse of its discretion. We address each argument in turn.

## I. ARE THE TRIAL COURT'S FINDINGS OF FACT CLEARLY ERRONEOUS?

¶ 15 The trial court identified six instances of contemptuous conduct and found, beyond a reasonable doubt, that each contemptuous act was intentional. We review the trial court's findings of fact for clear error. *Von Hake v. Thomas*, 759 P.2d 1162, 1172 (Utah 1988).

¶ 16 Clark urges us to view his conduct more sympathetically than did the trial court. Clark argues that (1) the trial court's order did not prohibit him from questioning the medical examiner about the toxicology report, and he therefore could not have knowingly violated that order; (2) the trial court's order did not prevent him from using evidence of an arrest to impeach a witness, and he therefore could not have knowingly violated that order; (3) his mention of threats of violence was in good faith and not in violation

---

3. The relevant portions of section 78–32–1 provide:

The following acts or omissions in respect to a court or proceedings therein are contempts of the authority of the court:

(1) Disorderly, contemptuous or insolent behavior toward the judge while holding the court, tending to interrupt the due course of a trial or other judicial proceeding.

(2) Breach of the peace, boisterous conduct or violent disturbance, tending to interrupt the due course of a trial or other judicial proceeding.

(3) Misbehavior in office, or other willful neglect or violation of duty by an attorney, counsel, clerk, sheriff, or other person appointed or elected to perform a judicial or ministerial service.

. . . .

(5) Disobedience of any lawful judgment, order or process of the court.

Utah Code Ann. § 78–32–1 (2002).

of any order; (4) no rule or order required him to be present at all times at all bench conferences; (5) he had wide latitude in making his closing argument and was free to characterize the evidence in any way he saw fit; and (6) he pulled on the sweatshirt only to make a point, not to tamper with it, and at any rate was not successful in tearing it. Relying on this version of the events at trial, Clark argues that the trial court's factual findings are clearly erroneous.

■ ¶ 17 We reject Clark's version of the events at issue because his mere recharacterization of the trial court's factual findings does not satisfy our threshold marshaling requirement. To successfully challenge a finding of fact, "an appellant must ... marshal all the evidence in support of the finding and then demonstrate that the evidence is legally insufficient to support the finding even when viewing it in a light most favorable to the court below." *Wilson Supply, Inc. v. Fradan Mfg. Corp.*, 2002 UT 94, ¶ 21, 54 P.3d 1177. Accordingly, Clark was required to "present, in comprehensive and fastidious order, every scrap of competent evidence introduced at [the hearing] which supports the very findings [he] resists." *Chen v. Stewart*, 2004 UT 82, ¶ 77, 100 P.3d 1177. In short, he should have played the "devil's advocate" by "remov[ing][his] own prejudices and fully embrac[ing] the [State's] position." *Id.* ¶ 78 (internal quotations omitted). Clark's tactic of simply rearguing and recharacterizing the trial court's factual findings does not constitute marshaling. *Id.* ¶ 77 ("What appellants cannot do is merely reargue the factual case they presented in the trial court."). We therefore affirm the trial court's findings that Clark committed each of the alleged acts identified by the trial court, that he did so knowingly, and that each contemptuous act was proven beyond a reasonable doubt. *See id.* ¶ 80 ("If the marshaling requirement is not met, the appellate court has grounds to affirm the court's findings on that basis alone."). Having rejected Clark's challenge to the trial court's factual findings, we rely on those findings for our remaining analysis.

## II. DID THE TRIAL COURT'S FACTUAL FINDINGS JUSTIFY CLARK'S CONTEMPT CITATION?

■ ¶ 18 We next consider whether the trial court's factual findings provide a sufficient basis for the order of contempt. We review the trial court's application of its findings of fact to the applicable legal standard for abuse of discretion. *See Clark v. Clark*, 2001 UT 44, ¶ 14, 27 P.3d 538. In other words, having concluded that the trial court's findings of fact are not clearly erroneous, "[w]e review [the] trial court's exercise of its contempt power to determine whether it exceeded the scope of its lawful discretion." *Shipman v. Evans*, 2004 UT 44, ¶ 39, 100 P.3d 1151.

¶ 19 Before proceeding with our review, we note two things. First, Clark's challenge to the contempt order focuses on his contention that the trial court's version of the events was clearly erroneous and therefore did not support the order. Clark did not address, as we do here, whether the facts as found by the trial court support the contempt order. Second, the trial court's findings of fact produced a single contempt citation. Clark was held in contempt for a continuous course of misconduct throughout the four-day trial, not for six discrete acts of contempt. Accordingly, rather than determining whether each discrete act rises to the level of contempt, we consider Clark's conduct as a whole unless some special analysis of a particular finding is warranted.

¶ 20 The trial court's conclusion that Clark violated its order on the motion in limine merits such particularized analysis. Under Utah Code section 78–32–1, "[d]isobedience of any lawful judgment, order or process of the court" constitutes contempt. Utah Code Ann. § 78–32–1(5). We elaborated on this particular subsection in *Von Hake v. Thomas*, 759 P.2d 1162 (Utah 1988), stating that a party seeking to "prove [criminal] contempt for failure to comply with a court order" is required to demonstrate, beyond a reasonable doubt, "that the person cited for contempt knew what was required, had the ability to comply, and intentionally failed or refused to do so." *Id.* at 1172.

¶ 21 Each of these requirements has been satisfied here. The trial court found that its order prevented Clark from "ask[ing] the medical examiner about the toxicology report" and mandated that "only certified convictions for felonies or any crime involving an act of dishonesty could be used to impeach a witness." The court also found that Clark knew and understood the content of its order and "had the ability to comply" with it, but nevertheless "willfully and intentionally" violated it. Most importantly, the court found each of these elements to have been established beyond a reasonable doubt.

¶ 22 Having concluded that Clark's violation of the trial court's order on the motion in limine satisfied the requirements for a finding of contempt under *Von Hake*, we now examine Clark's conduct as a whole in order to determine whether the trial court abused its discretion in finding that conduct contemptuous.[4] We conclude that it did not.

¶ 23 Not only did Clark twice contemptuously flaunt a valid court order in violation of section 78–32–1(5) of the Utah Code, he also attempted to frighten the jury by alluding to threats of violence, disrespectfully and defiantly abandoned bench conferences, and attempted to tamper with a crucial piece of evidence.[5] This conduct independently qualifies as contempt under other subsections of section 78–32–1. Specifically, it constitutes (1) "[d]isorderly, contemptuous or insolent

behavior toward the judge ..., tending to interrupt the due course of a trial," Utah Code Ann. § 78–32–1(1); (2) "[m]isbehavior in office, or other willful neglect or violation of duty by an attorney," *id.* § 78–32–1(3); and (3) "unlawful interference with the process or proceedings of a court," *id.* § 78–32–1(9). We therefore hold that the trial court did not abuse its discretion in relying on those acts to hold Clark in contempt.

## III. DID THE TRIAL COURT'S ALLEGED BIAS INTERFERE WITH CLARK'S OBLIGATION TO DILIGENTLY REPRESENT HIS CLIENT?

¶ 24 Clark argues that the trial court demonstrated bias by issuing rulings that were erroneous and damaging to his case and by preventing him from employing trial strategies and techniques that he would have otherwise employed. Clark argues that this bias adversely influenced the court's management of the trial and curtailed his ability to zealously represent his client. We first explore Clark's claim that the trial court was biased against him. We then explore the relationship between the contempt order and Clark's duty to zealously represent his client.

### A. Was the Trial Court Biased?

¶ 25 To establish bias, Clark points to a letter the trial court sent to the Utah State

---

4. Clark insinuates that each instance of contemptuous behavior, not just those constituting a violation of a court order under section 78–32–1(5), must comply with *Von Hake's* three-part test. We disagree. The *Von Hake* test comes into play only when "prov[ing] contempt for failure to comply with a court order." 759 P.2d at 1172. Our statement in *Thomas v. Thomas*, 569 P.2d 1119 (Utah 1977), that a party must prove what would become the three *Von Hake* elements "in order to justify a finding of contempt and the imposition of a jail sentence," *id.* at 1121, is not to the contrary inasmuch as *Thomas* involved only contempt for violation of a court order, *id.* at 1120–21.

5. The State concedes that the trial court's finding that Clark based his closing argument on facts not in evidence, taken alone, does not rise to the level of contempt. But it nevertheless argues that we should rely on that finding because Clark's argument was merely an extension of his earlier attempt to induce the medical examiner to testify as to the results of the toxicology report.

We are mindful of Clark's failure to properly challenge the trial court's finding of fact on this issue, we doubt that evidence of cocaine metabolite in the victim's system supports the inference that the victim was "hopped up on coke," and we agree that the events of the trial should be viewed as a whole, but we nevertheless reject the State's argument. The fact is that Clark succeeded, however underhandedly, in getting the information in the toxicology report admitted into evidence and that attorneys making closing arguments "have a right to discuss fully from their standpoints the evidence and the inferences and deductions arising therefrom." *State v. Lafferty*, 2001 UT 19, ¶ 92, 20 P.3d 342 (internal quotations omitted). The fact that we side with Clark on this issue, however, does not require reversal of Clark's contempt citation. Even if we ignore the trial court's finding that Clark inappropriately based his closing argument on facts not in evidence, the remaining findings paint a vivid picture of Clark's disrespect for the authority of the court and the processes of justice.

Bar following the hearing on the State's motion in limine. Evidently, the trial court was unimpressed with both Clark's comportment at the hearing and disparaging comments that Clark had made thereafter to a local newspaper. It accordingly sent the letter requesting an investigation into Clark's conduct. Clark included the letter as an addendum to his brief, claiming that it is part of the record.

¶ 26 The State contends that we cannot consider the letter because it is not part of the record. Relying on *Yost v. State,* 640 P.2d 1044 (Utah 1981), Clark disagrees, arguing that the letter is part of the record because the trial court, as the letter's author, was aware of it. We find the circumstances presented by *Yost* to be distinguishable from those presented in this case and accordingly agree with the State.

¶ 27 As a general rule, we "will not consider evidence not made part of the record on appeal." *Lovendahl v. Jordan Sch. Dist.,* 2002 UT 130, ¶ 51, 63 P.3d 705. But in *Yost,* we concluded that an affidavit attached to a motion for summary judgment and "presented to the same judge that subsequently tried the case, sitting without a jury," was part of the record. 640 P.2d at 1047. That conclusion, however, arose from "facts peculiar to [that] case." *Id.* In *Yost,* we used the word "record" to mean "the record *upon which the decision was based.*" *Id.* (emphasis added).

¶ 28 In this case, there is no indication that the trial court relied on the letter in issuing the contempt order. The letter raised concerns about Clark's behavior during the pre-trial hearing on the State's motion in limine and his comments to the media regarding the court's resolution of that motion, neither of which provided a basis for the subsequent contempt order.

¶ 29 In addition, Clark merely contends that the trial court, as the letter's author, was aware of the letter. The fact that the trial court was aware of the letter does not mean that the letter was presented to it or that the letter provided a basis for its decision. We are cognizant of Clark's claim that he could not have presented the letter to the trial court because he was unaware of it.

Nevertheless, *Yost*—the only case on which Clark relies—simply does not contemplate classifying an item as part of the record on appeal unless that item was presented to or considered by the trial court. Clark's reliance on *Yost* is therefore misplaced, and Clark has provided us with no other justification for departing from our general practice of declining to consider evidence not presented to the trial court.

¶ 30 In any event, however, the letter is not evidence of bias. In writing the letter and reporting Clark's conduct to the Utah State Bar, the trial court was merely discharging its duty to report ethical violations. *See* Utah Code of Judicial Conduct, Canon 3D ("A judge should take or initiate appropriate disciplinary measures against a ... lawyer for unprofessional conduct of which the judge may become aware."). We cannot conclude that a judge becomes biased simply by complying with ethical rules, and we encourage judges to report unethical conduct whenever it occurs.

¶ 31 Moreover, all of Clark's allegations of bias center on the trial court's various responses to his in-court behavior. Specifically, Clark asserts that (1) the trial court demonstrated its bias by erroneously reprimanding him for his antics; and (2) because the trial court's findings were clearly erroneous, they were the product of bias. "[B]ias and prejudice are only improper," however, "when they are personal," *In re Inquiry Concerning a Judge,* 2003 UT 35, ¶ 6, 81 P.3d 758 (internal quotations omitted), and such bias "must usually stem from an extrajudicial source, not from occurrences in proceedings before the judge," *id.* ¶ 7 (internal quotations omitted). Clark's first argument is without merit because the contempt order was based only on Clark's in-court conduct, which was indeed reprehensible. Clark's second argument similarly fails because, as previously discussed, the trial court's findings of fact were not clearly erroneous and more than adequately support the contempt order.

¶ 32 We find that the trial court demonstrated admirable restraint, not bias, in its management of the trial and in its dealings

with Clark. Because Clark's contemptuous acts occurred "in the immediate view and presence of the court," the court would have been justified in summarily punishing Clark. *See* Utah Code Ann. § 78–32–3. Instead, the trial court made every effort to keep the trial running smoothly, admonishing Clark only out of the jury's presence and waiting until after the conclusion of the trial to give Clark a full hearing on the State's motion to hold him in contempt. Because that degree of patience is not indicative of bias, and because Clark has failed to establish any extrajudicial source of the alleged bias, we reject Clark's claim of bias.

### B. The Relationship Between Contempt and Counsel's Duty of Zealous Representation

¶ 33 We now turn to Clark's claim that the trial court's bias infringed on his ability to zealously represent his client as required by rule 1.3 of the Utah Rules of Professional Conduct. Clark also contends that his violation of the court's order was not contemptuous because it did not demonstrate a level of obstinacy sufficient to remove his actions from the realm of zealous advocacy.

¶ 34 Our conclusion that the trial court was not biased obviates the need for us to address Clark's claim that the court's bias kept him from zealously advocating his client's interests. We nevertheless believe it appropriate to address Clark's general argument that the duty of zealous advocacy imposed by rule 1.3 somehow insulated his actions from contempt proceedings.

¶ 35 Rule 1.3 means exactly what it says: attorneys must "act with reasonable diligence and promptness in representing a client." Utah R. Prof'l Conduct 1.3. Clark suggests that rule 1.3 constitutes a license to advocate his clients' interests "despite opposition, obstruction or personal inconvenience." *Id.* cmt. In essence, Clark's argument is that "zealous advocacy" includes any behavior except that which demonstrates an extremely high degree of obstinacy. We disagree. Zealous advocacy is advocacy within the bounds set by court orders and the rules of ethics. *See id.* (noting that attorneys "may take whatever *lawful and ethical* measures

are required to vindicate a client's cause or endeavor" (emphasis added)). It is not a license to seek a particular result without regard to such orders and rules, even unfavorable and inconvenient ones. By definition, then, an attorney who violates court orders and breaks ethical rules is not zealously advocating his client's cause and cannot claim immunity from contempt proceedings.

¶ 36 Court orders and ethical rules are not the kind of "obstruction" to which rule 1.3 refers, nor are they an "inconvenience" to be surmounted or a form of "opposition" to be overcome. The rules of ethics dictate that attorneys may not protest adverse rulings by violating them in the name of zealous advocacy. The proper method for contesting an adverse ruling is to appeal it, not to violate it.

### IV. DID THE TRIAL COURT ABUSE ITS DISCRETION IN SENTENCING CLARK?

¶ 37 Having disposed of Clark's challenges to the substance of the contempt order, we now address Clark's claim that his sentence of thirty days in jail, with no work release or possibility of time off for good behavior, was excessive and constituted an abuse of discretion. A trial court's sentence for contempt, like the exercise of its contempt power, is reviewable for abuse of discretion. *Thurgood v. Uzelac (In re S.T.T.),* 2003 UT App 439, ¶ 7, 83 P.3d 398.

¶ 38 Utah Code section 78–32–10 empowers courts other than justice courts to impose "a fine not exceeding $1,000," imprisonment "not exceeding 30 days, or both." Utah Code Ann. § 78–32–10. We have held, however, that a court should not imprison a contemnor "unless [the contemnor] has manifested such obstinacy in disobedience of the court order that it is necessary to accomplish that which equity and justice demand." *Thomas v. Thomas,* 569 P.2d 1119, 1121 (Utah 1977).

¶ 39 Clark's behavior in this case satisfies this requirement. Clark knowingly violated a lawful court order on two separate occasions, sought to frighten and prejudice the jury, demonstrated a lack of respect for the court, and tried to alter an important piece of

evidence. During Clark's contempt hearing, the trial judge admonished Clark:

> I've never, never witnessed anybody like you in a courtroom. I just think you showed total lack of respect for the legal system. You showed a lack of respect for the court, the prosecutors, the witnesses, the victim's family. My impression is that this was simply an attempt to create chaos in the courtroom. You wanted to disrupt the proceedings, you wanted to shock the jury, and you wanted to sensationalize this case.

We agree that Clark's conduct demonstrated the requisite obstinacy to justify a jail sentence. We therefore hold that the sentence imposed by the trial court, which was within the limits specified by section 78–32–10, fell within the scope of its discretion.[6]

## CONCLUSION

¶ 40 Because Clark did not properly marshal evidence in support of the trial court's findings of fact, he cannot challenge them on appeal. Those findings, which bespeak an attorney who, in a course of continuous conduct, defied the court and the rules of ethics almost at every turn, adequately support the contempt order. Contrary to Clark's argument, the trial court was not biased, but appropriately sought to correct Clark's behavior in a restrained manner. Finally, the sentence the trial court imposed was suitably tailored to punish Clark's contemptuous behavior. Affirmed.

¶ 41 Chief Justice DURHAM, Associate Chief Justice WILKINS, Justice DURRANT, and Justice NEHRING concur in Justice PARRISH's opinion.

---

6. Section 78–32–10 places no limits on a court's power to withhold work release or time off for good behavior. *See* Utah Code Ann. § 78–32–10.